**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Jul 31, 2023

IN RE:

DAVID LEE POTTS and GLORIA
DENISE POTTS,

                **Debtors.**

Case No. 22-11185-M
Chapter 13

## MEMORANDUM OPINION

*"If the law supposes that, the law is an ass—an idiot."*[1]

*"The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely."*[2]

*"Nothing is so unproductive as the law."*[3]

As we see, the law has been called many things. An ass, a causeway, and unproductive to boot. In this case, the law gets another name: a template. Something more than guidance, and less than governing. This unique foray into statutory interpretation is understandable, for it is the only road to victory for one of the parties. Unfortunately, the argument that a statute is a "template" rather than a governing rule of law is less of a path, and more of a dead end. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

---

[1] Charles Dickens, OLIVER TWIST.
[2] Robert Bolt, A MAN FOR ALL SEASONS.
[3] Gilbert Parker, https://www.brainyquote.com/quotes/gilbert_parker_209790?src=t_law [https://perma.cc/65NZ-MJWH].

## Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b).[4]

Venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this bankruptcy case is

proper pursuant to 28 U.S.C. § 157(a).  Issues of claims allowance are core proceedings as defined

by 28 U.S.C. § 157(b)(2)(B).

## Summary Judgment Standard

We are here on a motion for summary judgment (the "Motion").[5] The United States

Court of Appeals of the Tenth Circuit has held that

> Summary judgment is appropriate when "the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter of
> law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on
> each side so that a rational trier of fact could resolve the issue either way." *Adler v.
> Wal–Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is
> 'material' if under the substantive law it is essential to the proper disposition of the
> claim." *Id*. Put differently, "[t]he question . . .  is whether the evidence presents a
> sufficient disagreement to require submission to a jury or whether it is so one-sided
> that one party must prevail as a matter of law." *Shero v. City of Grove*, 510 F.3d
> 1196, 1200 (10th Cir. 2007) (quotation omitted). "On summary judgment the
> inferences to be drawn from the underlying facts must be viewed in the light most
> favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith
> Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotation
> omitted).[6]

The Court will apply this standard to the Motion.

## Findings of Fact

David Lee Potts and Gloria Denise Potts (collectively the "Pottses" or "Debtors")

contracted with Executive Homes, LLC ("Executive") for the purchase of a house and the real

---

[4] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[5] Motion for Summary Judgment, Docket No. 40.  The Court held a hearing on the Motion on May 30, 2023. At the hearing, counsel for both parties admitted there were no facts in dispute and agreed the matter could be submitted to the Court on the facts set forth in the Motion. Whether we are here on a motion for summary judgment or a submission on stipulated facts, the result is the same.

[6] *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

property upon which the house was constructed (the "Property") in the city of Tulsa, Oklahoma. The sale contract (the "Contract"), drafted by Executive, dated May 31, 2022, and entitled "Purchase Agreement for Sale of New Home and Real Estate," provided for a purchase price of $517,400, with $20,000 paid by the Pottses as "earnest money" upon execution of the Contract, and the balance due at closing.[7]  The Contract expressly provided that "Executive agrees to sell and Buyer [the Pottses] agrees to buy a newly constructed home (the 'New Home') situated on the Property," and contained the legal description of the Property.[8]  At no time did the Pottses hold title to the Property; title remained with Executive throughout the construction process. On September 16, 2022, Executive advised the Pottses that construction of the New Home was complete, and Executive was ready to close the sale of the Property. The Pottses never closed. Executive retained the $20,000 and eventually relisted the Property for sale. On May 18, 2023, Executive executed a new contract with Daphne Dowdy ("Dowdy") for sale of the Property with a contract price of $524,900, using the same form contract as it used with the Pottses.[9]

On December 11, 2022, the Pottses filed a petition for relief under Chapter 7 of the Bankruptcy Code. In their schedules, the Pottses listed Executive as a creditor with a contingent, unliquidated, and disputed debt of $0.00.[10] On January 4, 2023, Executive filed a proof of claim in this case in the amount of $159,741, listing as the basis for the claim "contract to purchase new home and real estate lost profit." (the "Executive Claim").[11] The Executive Claim is silent as to

---

[7] *See* Claim No. 3, Docket No. 3-1, at 4.

[8] *Id.* § 1. For purposes of clarity, the Court will use the contractual term "New Home" to describe the structure built by Executive on the Property.

[9] Docket No. 43-1, at 2-4.

[10] While this may at first blush seem odd (how can there be a disputed debt of zero dollars?), it is not. Oftentimes debtors schedule a contingent or disputed claim for notice purposes, without admitting its validity or listing an amount of the debt.

[11] Claim No. 3.

how Executive calculated its claim amount.[12] At the May 30, 2023, hearing on the Motion, counsel for Executive advised the Court that the $159,741 represented the net profit Executive would have received from the Pottses had they closed the sale under the terms of the Contract. The Court accepts this statement solely for purposes of ruling on the Motion.

On March 20, 2023, Debtors objected to the Executive Claim ("the Objection").[13] Debtors listed three bases for the Objection:

1. Executive failed to provide documentation to support the claimed amount of $159,741;

2. The earnest deposit of $20,000 was in the nature of liquidated damages, and, by retaining the earnest deposit, Executive elected to keep the $20,000 as its sole remedy for breach; and

3. The Property was listed for sale (and has since sold) for more than the purchase price agreed to between Debtors and Executive; therefore, Executive has suffered no damages and has no claim for any additional sums from the Debtors under Oklahoma law.[14]

Executive timely filed its resistance to the Objection (the "Response"),[15] asking that the claim of $159,741 be allowed in its entirety, arguing that:

---

[12] Executive claims these calculations are trade secrets, and its damage calculations are "competitively sensitive information that would be valuable to [Executive's] competitors if they could freely access the same." *Motion to Enter Agreed Protective Order*, Docket No. 36. At this point in the case, the Court is not privy to Executive's damage calculations.

[13] Objection to Proof of Claim Filed by Executive Homes, LLC (Proof of Claim # 3), Docket No. 34. Debtors also added a fourth basis for disallowing the Executive Claim, arguing that "the value of the [Property] is worth more [sic] than the amount due under the contract." In the eyes of the Court, this argument is encompassed within the third argument listed above.

[15] Docket No. 37.

1. Executive has agreed to provide supporting documents and calculations upon entry of a protective order;

2. The earnest money deposit of $20,000 was simply a partial payment, without any agreement that it be treated as liquidated damages; and

3. Executive is a "volume builder" of homes, which means it has an unlimited ability to construct homes and an equally unlimited supply of buyers for every home it builds.[16] Given this infinite capacity, Executive claims to be entitled to the lost profit on every contract for the sale of a home, regardless of whether that home is ultimately sold to another party.[17]

At a hearing held on May 30, 2023, the parties agreed that, with respect to the issues raised in the Motion, the facts recited above are not in dispute. The Objection is now ripe for decision.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

---

[16] The latter statement appears to have been contradicted by Alex Trinidad, the President and General Counsel for Executive, in a sworn declaration executed by Mr. Trinidad on May 10, 2023. Docket No. 41, Exhibit 2. In that declaration, Mr. Trinidad stated under oath that Executive was suffering additional damages "while it struggles to find a buyer in this difficult marketing environment." *Id.* ¶ 8. The claim of a "difficult marketing environment" is somewhat inconsistent with a claim that Executive can easily sell every home it builds.

[17] Apparently, Executive takes the position that $500,000 homes are a lot like Doritos: "Crunch all you want, we'll make more." This is taken from an advertising campaign used by Frito-Lay in the 1980s and 1990s to promote sale of its Cool Ranch Doritos. The main celebrity spokesperson for this campaign was Jay Leno. If you want to see one of the ads, go to https://perma.cc/YWA3-F33C.

## Conclusions of Law

Section 502(b)(1) of the Bankruptcy Code states that the bankruptcy court shall allow a claim, "except to the extent that—such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]"[20] As this Court has previously held, "[t]here is one significant limitation on the definition of a claim: in order for there to be a claim under the Bankruptcy Code, it must be actionable under state law."[21] The question therefore is whether Executive has a claim against the Debtors for its lost profits under the terms of the Contract and Oklahoma law, notwithstanding the fact that Executive later sold the Property for an amount greater than it had a right to receive under the Contract.

Oklahoma statutory law appears to provide a simple answer:

> **§ 28. Breach of agreement to buy.** The detriment caused by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him.[22]

A rather plain proposition: since the spurned seller of real estate gets to keep their property, the measure of damages upon breach by a buyer is the difference between the market value of the property and the contract price. If the market value of the property at the time of breach is more than the contract price, the seller has not been harmed, and there are no damages. If the market value is less, the breaching buyer must pay the difference and, as a result, the seller is made whole. It is a concept law students are exposed to in the early days of their first-year contracts class.

---

[20] § 502(b)(1).
[21] *Frank and Barbara Broyles Legacy Foundation v. Nichols (In re Nichols)*, 509 B.R. 722, 726 (Bankr. N.D. Okla. 2014) (relying upon *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331, 336-37 (10th Cir. 1994)).
[22] Okla. Stat. tit. 23, § 28 (hereafter "§ 28").

In the only factually similar published Oklahoma decision the parties (and the Court, for that matter) could unearth, § 28 was applied without controversy. In *Oltman Homes, Inc., v. Mirkes*,[23] Oltman Homes entered into a contract to sell a home to Christopher and Jenifer Mirkes. The purchase price was set at $180,400, and the house was built by Oltman Homes on property owned by Oltman Homes. The house was completed, and the Mirkes refused to close. Oltman Homes went on to sell the house to another buyer for $179,400, and sued the Mirkes for the difference in price plus "costs associated with the special upgrades and change orders demand by the [Mirkes][.]"[24] After trial, a jury awarded Oltman Homes some $4,435.77 in upgrade costs, and the court tacked on approximately $7,000 in costs and attorneys' fees.[25] The Mirkes appealed.

The Oklahoma Court of Civil Appeals ("CCA") affirmed in part and reversed in part. The CCA found no basis for the award of attorneys' fees, reversing that portion of the judgment. The CCA also found Oltman Homes had proven only $2,452.91 in damages and reduced the damage award accordingly. As it did so, the CCA emphasized the simplicity of a damage award under § 28:

> ¶ 9 Before proceeding with our analysis, it is necessary to define the proper measure of damages. We begin by noting that, in general, damages for breach of contract are found in 23 O.S.2001, § 21:
>
> > For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin.

---

[23] 2008 OK CIV APP 64, 190 P.3d 1182.
[24] 190 P.3d at 1184.
[25] *Id.* at 1184-85.

¶ 10 Because contracts to sell real property often contain readily ascertainable values, the measure of damages for breach of these types of contract is governed by 23 O.S.2001, § 28:

> The detriment caused by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract, over the value of the property to him.

¶ 11 As we held in *Reid v. Auxier*, 1984 OK CIV APP 33, ¶ 16, 690 P.2d 1057, 1061:

> This language has been construed to mean ''the difference between the actual contract price and the actual value of the land at the time of the breach.'' *Harman v. Franks*, 178 Okl. 560, 565, 63 P.2d 54, 59 (1936).

¶ 12 We note the measure of damages set out in § 28 is limiting. It is the remainder of an arithmetical subtraction operation.[26]

The trial court in *Oltman Homes* used the definition of damages set out in § 28 as a jury instruction without objection.[27] The *Oltman Homes* court found the price obtained for the real estate on the second sale, which occurred 26 days after the date on which the Mirkes originally agreed to close, to be the best evidence of the market value of the real estate in order to calculate of damages.[28]

The facts in *Oltman Homes* are nearly identical to those presently before the Court. We have a home buyer and a builder/seller. In *Oltman Homes,* the builder/seller was the owner of the real estate at all relevant times, as evidenced by the fact it was able to resell the property after the breach by the Mirkes. Here, Executive held title to the Property until Executive sold the Property

---

[26] *Id.* at 1185.

[27] *Id.* at 1187.

[28] *Id.* at 1188 ¶ 31. In its Objection, Executive argued that "even if the *Oltman* damage analysis is applicable to this matter, which is denied as set forth below, the Debtors have failed to prove that the Home was worth the same or a greater amount on December 11, 2023 [sic], as it was on September 21, 2022." Docket No. 41 at 4 (footnotes omitted). Thereafter, counsel for Executive acknowledged at the May 30, 2023, hearing that the Property had been sold for $524,900, an amount more than the contract price between Executive and the Pottses. There is no longer any factual dispute about the market value of the Property.

to Dowdy. If we apply the analysis undertaken by the CCA in *Oltman Homes* to the undisputed facts in this case, Executive has no claim for lost profits. The Property sold for an amount greater than the sales price in the Contract, generating the very profit Executive claims to have lost (and perhaps more). In addition, Executive holds $20,000 in moneys paid to it by the Debtors. The standards of § 28 have been satisfied, and, if they are to be applied, Executive has been made whole.

Not so fast, says Executive. Executive claims § 28 does not create a rule of law but is merely a "template" a court may consider, but need not follow, in assessing damages when a buyer of real estate breaches the contract to buy. In this case, Executive argues § 28 should not be applied because Executive is a "'volume' or 'production' builder [] that possesses the capability to perform several contracts simultaneously."[29] Executive contends its ability to construct homes is infinite, as is the number of buyers standing in line to purchase the homes it builds. The parties have not cited, and the Court could not locate, a single published Oklahoma case which used the phrase "volume" or "production" builder with respect to a real estate transaction. Nor is there anything in § 28 to indicate it excludes a self-defined volume or production builder. As a result, this Court declines to accept Executive's invitation to toss the reasoning of *Oltman Homes*, which thoroughly discussed § 28 and its purposes, casually aside. The theory of a "volume seller of real estate" has been constructed out of whole cloth, with no more substance than the proverbial house made of straw (or sticks if you prefer).

The cornerstone of Executive's argument is the assumption that the Contract is a contract for the construction of a house rather than a contract for the sale of improved real estate. The Court need only look to the four corners of the Contract to find that the Contract is a contract for the sale

---

[29] Docket No. 37, at 3 ¶ 16.

and purchase of real estate. The Contract is not titled "construction contract"; it is entitled "Purchase Agreement for Sale of New Home and Real Estate." Section 1 of the Contract describes the real estate to be conveyed by legal description and street address.[30] The Contract expressly states that "Executive agrees to sell and Buyer agrees to buy a newly constructed home"[31] built upon real estate owned by Executive and to be conveyed by general warranty deed[32] with a guaranty of "good and merchantable title[.]"[33] If it walks like a duck, quacks like a duck, and swims like a duck, it is most likely a duck. Furthermore, when Executive sold the Property to Dowdy, it used *the exact same form of contract* that forms the basis for Executive's claim against the Debtors. Surely the contract between Executive and Dowdy cannot be a construction contract, given that the New Home was complete at the time of the sale to Dowdy.[34] In both instances, Executive is the seller of improved real estate, governed by § 28.

Executive relies upon several treatises and cases in support of its "volume builder" argument. Close examination reveals numerous cracks in the foundation Executive attempts to build. Let us begin with Executive's reliance upon Oklahoma Uniform Jury Instruction 23.51, which reads as follows:

> If you decide for [Plaintiff] on [his/her/its] claim for breach of contract, you must then fix the amount of [his/her/its] damages. This is the amount of money that is needed to put [him/her/it] in as good a position as [he/she/it] would have been if the contract had not been breached. In this case, the amount of damages should be determined as follows: [set out the appropriate measure of damages].[35]

Nothing to see here, so Executive moves to this section of the "Notes on Use":

---

[30] Contract, Docket No. 3-1, at 4 § 1.

[31] *Id*. § 2.

[32] *Id*. § 8.

[33] *Id*. § 7.

[34] The Court is fully aware that the contract between Executive and Dowdy required Executive to install "soft-close" accessories on all cabinet doors and drawers on the Property. A nice touch to be sure, but hardly the construction of a home.

[35] *Oklahoma Uniform Jury Instruction* 23.51, as cited by Executive in Docket No. 41, at 5-6.

> If the plaintiff is a builder seeking damages for a ***property owner's*** breach of a construction contract, then the last sentence might read: "In this case, the amount of damages would be the price stated in the contract that has not been paid." If the builder seeks damages for substantial performance, Instruction No. 23.56 should be given instead of this Instruction No. 23.51.[36]

The devil is in the details. Executive is not seeking a claim against the property owner—Executive ***is*** the property owner. The note on use relied on by Executive talks about circumstances where a contractor builds a structure on property the contractor does not own. In that situation, the contractor has no right to resell the real estate where the structure was built. The contractor's only recourse is to sue the owner of the property for the agreed upon contract price, assuming the work was completed. Not so when the contract is a contract for the sale of real property. If, as is the case here, the contract is breached prior to closing, the seller retains title to the real estate and, as a result, can resell the property and recover most if not all the value it expected to receive for the property. If this scenario sounds familiar, it is because these are the facts of *Oltman Homes*, the facts presently before the Court, and the result § 28 dictates. Section 28 is not some manner of "template" to be applied to the law; in Oklahoma, § 28 ***is*** the law.

Executive continues pouring a cracked driveway of legal reasoning with its reliance upon the following quote from *McCormick on Damages* ("*McCormick*"):

> [W]here owner "renounces the contract before the builder has entered upon the work or preparation thereof, the builder recovers the loss of the expected profit, namely, the difference between the agreed price and what it would cost the builder to carry out his bargain."[37]

Use of the quote in this case seems inapposite, given that the principle of law introducing the quotation in § 164 begins with this sentence: "***When the __owner__ has repudiated the contract after***

___

[36] *Id.* (emphasis added).

[37] Docket No. 41, at 7 n.12 (quoting Charles T. McCormick, HANDBOOK ON THE LAW OF DAMAGES § 164 (West Pub. Co. 1935)).

*the **builder** has partly performed*, the builder may sue on the contract for entire damages."[38] At

no time have the Pottses been the owners of the Property; title to the Property remained with

Executive until the conveyance to Dowdy. Moreover, Executive claims the breach of the Contract

occurred after construction of the New Home on the Property was complete. Section 164 of

*McCormick* does not apply to the Contract.

Perhaps it would be better to apply the correct section of *McCormick*:

### ACTION BY THE VENDOR; DAMAGES FOR TOTAL BREACH OF CONTRACT BY PURCHASER

**186.   The measure of general damages for the purchaser's refusal to carry out a land sale contract is the excess, if any, of the agreed price over and above the market value of the land at the time fixed in the contract for completing the sale.**

If the purchaser under a land sale contract refuses to go on with the contract at the time fixed for closing "the trade" or otherwise, before the conveyance is delivered, commits such a serious breach as to amount to a repudiation, the vendor may have a wide choice of remedies. (1) He may *rescind*—usually a poor expedient, since it necessitates the restoration of any payments made by the purchaser. (2) He may sue in equity for *specific performance* of the contract. (3) In many jurisdictions, he may secure, in equity, a decree *foreclosing* the purchaser's rights under the contract. (4) In a few jurisdictions, he may tender a deed and *sue at law for the unpaid purchase price*. (5) Finally, he may resort to an *action at law for damages* for breach of the contract of purchase. This last remedy will most often be resorted to where the vendor is still in possession and where the purchaser has, at an early stage, repudiated his obligation under the contract.

The normal standard of general damages for such a breach is the value of the vendor's bargain; that is, the excess, if any, of the entire purchase price of the land at the time agreed upon for conveyance, over and above the market value, with interest, but deducting from such difference the amount of any deposit made by the purchaser of any partial payment of the price.[39]

The principle of law stated by *McCormick* in § 186 is substantively identical to § 28. The Court

doubts this is mere coincidence.

---

[38] McCormick, *supra* note 37, § 164, at 640 (emphasis added).
[39] *Id.*, § 186 at 709-10. (footnotes omitted)

Executive continues to use the wrong tool for the job by citing the following section of

*Williston on Contracts ("Williston")*:

> Where no payments on account have been made, a contractor who is not in default
> should recover the total price promised less the cost of performing, in case no work
> has been done, or of completing performance of the work, where there has been
> partial performance. This will put the contractor in as good a position as he or she
> would have been in had there been no breach. (Emphasis added)
>
> . . .
>
> Since it is sometimes easier to prove the total cost of a whole building or
> construction than the cost of completion, the rule is sometimes stated that recovery
> may be had of the total contract price less the total cost plus the expense incurred
> in part performance.
>
> WILLISTON ON CONTRACTS, § 66:14 — Measure of Contractor's Recovery.[40]

A review of *Williston* as actually written opens another door. Section 66.14 is <u>not</u> entitled just

"Measure of Contractor's Recovery," as Executive would have the Court believe; instead, the full

title of the section is "Measure of contractor's recovery ***for breach of employment contract***."[41]

Executive is not claiming to be an employee of the Debtors, or a contractor hired by the Debtors

to perform work on property owned by the Debtors. Equally fascinating is the omission by

Executive of the statement in the same section of *Williston* that "[o]f course, the rule of avoidable

consequences applies to the contractor, so that the contractor cannot recover for losses that could

have been prevented."[42] Executive has the same duty to mitigate damages as does every other party

---

[40] *See* Docket No. 41, at 6.

[41] 24 *Williston on Contracts* § 66:14 (4th ed.) (emphasis added). The Court does not appreciate the
omission, which appears to be an attempt to make *Williston* somehow more persuasive. If
Executive assumed the Court would not check the authorities cited to it, Executive is sadly
mistaken. To put it another way (with apologies to the Bard), parsing is such sweet sorrow.

[42] *Id.* (footnote omitted). Put simply, we are talking about mitigation of damages. The Oklahoma
Uniform Jury Instructions recognize the duty of a contracting party to mitigate its damages. *See*
Oklahoma Uniform Jury Instruction No. 23.54 ("Recovery of damages is not allowed for any
losses that [Plaintiff] reasonably could have avoided.").

to a contract, which it did by selling the Property to Dowdy. Finally, Executive ignores the ugly truth (at least for Executive) that *Williston* devotes an entire section to the measure of a seller's damages for breach of a contract for the sale of real estate.[43]

> Unless the vendor has elected to accept, as the exclusive remedy, liquidated damages represented by the purchaser's deposit, where the vendor sues the purchaser for breach of contract, the vendor may recover for the loss of the bargain, and <u>the generally accepted measure of damages is the difference between the contract price and the fair market value of the property at the time of the breach</u>. . . . The price obtained by the vendor on a later resale of the property may be regarded as competent evidence of its fair market value on the date of the purchaser's breach, provided that the market conditions are similar and the time elapsed between the date of the breach and the date of the resale is not too great.[44]

This section, entitled "Measure of vendor's damages," is found in the portion of *Williston* entitled "Damages in Particular Situations – Real Estate Contracts – Damages for Breach of Contract for Sale of Land."[45]   Once again, we find analysis strikingly similar to the rule established by § 28. The Court is at a loss to understand why Executive is entitled to more than the difference between the contract price for the sale of the Property (with all improvements) and its market value, other than the argument that houses are like Doritos.

Executive turns next to the Restatement (Second) of Contracts, specifically §§ 346 and 347. Executive cites not to the sections themselves, but rather to an illustration and a comment, the latter of which is nowhere to be found in the Restatement (Second) of Contracts.[46] Let us begin by looking at each section:

---

[43] *See* § 66:80. Measure of vendor's damages, 25 *Williston on Contracts* § 66:80 (4th ed.)

[44] *Id.* (footnotes omitted) (emphasis added).

[45] *Id*. at Ch. 66(IV)(A).

[46] In fact, the comment cited by Executive is from the Restatement (First) of Contracts § 346, which is entitled "Damages for Breach of a Construction Contract." *Restatement (First) of Contracts* § 346 cmt. g (Am. L. Inst. 1932). The argument that this comment is somehow related to any section of the Restatement (Second) of Contracts is spurious.

### § 346 Availability of Damages

(1) The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.

(2) <u>If the breach caused no loss</u> or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages.[47]

### § 347 Measure of Damages in General

<u>Subject to the limitations stated in §§ 350-53</u>, the injured party has a right to damages based on his expectation interest as measured by

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.[48]

Executive asks the Court to focus on Illustration 6 to § 347, which it quotes as follows:

A contract is [*sic*] to build a house for B for $100,000. When it is partly built, B repudiates the contract and A stops work. A would have to spend $60,000 more to finish the house. The $60,000 cost avoided by A as a result of not having to finish the house is subtracted from the $100,000 price lost in determining A's damages. A has a right to $40,000 in damages from B, less any progress payments that he has already received.[49]

Illustration 6, fully and correctly cited (without typographical errors or misleading omissions),

reads as follows:

A contracts to build a house for B for $100,000. When it is partly built, B repudiates the contract and A stops work. A would have to spend $60,000 more to finish the house. The $60,000 cost avoided by A as a result of not having to finish the house is subtracted from the $100,000 price lost in determining A's damages. A has a

---

[47] *Restatement (Second) of Contracts* § 346 (Am. L. Inst. 1981) (emphasis added).
[48] *Id.*, § 347 (emphasis added).
[49] Docket No. 41, at 6.

right to $40,000 in damages from B, less any progress payments that he has already received. ***See Illustration 2 to § 344.***[50]

The last sentence (omitted by Executive in its citation) is key. We cannot understand Illustration 6 without considering Illustrations 1 and 2 to § 344. Both illustrations apply to a contract for the construction of a building upon land *owned by the other party to the contract*.[51] This Court, after a thorough review, has been unable to find a single case citing § 347 for the proposition advanced by Executive. Section 347 of the Restatement applies where the contract at issue is a contract to build improvements *on land owned by the other party to the contract*, not where the contract is a contract for the sale of real estate owned by the builder.

Executive's reliance on other treatises is just like a leaky pipe; it does not hold water. For example, Executive cites to the 1951 edition of *Corbin on Contracts* ("*Corbin*") in support of its argument that it is entitled to its lost profits.[52] With all due respect to the past, this Court chooses to rely upon the most current edition of the learned treatise:

---

[50] *Restatement (Second) of Contracts* § 347, cmt. d, illus. 6 (Am. L. Inst. 1981) (emphasis added).

[51] *Id.* at § 344 cmt. a, illus. 2 ("The facts being otherwise as stated in Illustration 1, B does not repudiate until A has spent $60,000 of the $90,000. A has been paid nothing and can salvage nothing from the $60,000 that he has spent. A now has an expectation interest of $70,000, the difference between the $100,000 price and his saving of $30,000 in not having to do the work. A also has a reliance interest of $60,000, the amount that he has spent. If the benefit to B of the partly finished building is $40,000, A has a restitution interest of $40,000."). The "facts as stated in Illustration 1" are unequivocal: "A contracts to build a building *on B's land* for $100,000." *Id.* illus. 1 (emphasis added).

[52] *See* Docket No. 41, at 7, n.12 (" ("Full performance of the construction contract by both parties would have left the building contractor in possession of the full contract price, less the entire cost of construction required of him by the contract. To put him in as good a position as this, in case of a breach by the defendant, it is necessary to let the building contractor get judgment for the full amount of the contract price promised, diminished by the amount that is saved by the building contractor by reason of his not having to complete the construction.") (citing 5 Corbin, CONTRACTS § 1094 (1951)).

> **§ 60.6 Building Contracts—Damages in Favor of Contractor for Breach by the Owner**
>
> The construction contractor is in many respects in the position of a seller of goods. There is, however, a major difference. Unlike the performance of the typical seller of goods, the contractor's performance is usually ***affixed to the land of another. Thus, such remedies as resale or replevin are unavailable to the aggrieved construction contractor***.[53]

In this case, Executive has the right of resale of the Property, a right it has exercised to its benefit.

So what, you might ask, is the proper measure of damages according to *Corbin* when the seller of

the real estate retains title to the real estate? The answer is easily found:

> **§ 60.12 Breach by Purchaser of Executory Contract to Buy Land—Effect of Provisions for Forfeiture and Liquidated Damages**
>
> In case of breach by the purchaser, the vendor's general damages are the ***full contract price minus the market value of the land at date of breach and also minus any payment received***. Costs of making a resale may be allowed as consequential or incidental damages. If foreseeable, other consequential damages are available.
> . . . .
> Nearly all courts today refuse to enforce penalties and forfeitures, awarding to the injured vendor no more than compensation measured by the amount of actual loss.[54]

*Corbin* and § 28 are harmonious, notwithstanding Executive's claims to the contrary. The same is

true with respect to the analysis of Professor Patterson in the law review article cited by

Executive.[55]

---

[53] 11 *Corbin on Contracts* § 60.6 (MB 2023) (emphasis added).

[54] Id. § 60.12 (emphasis added) (footnotes omitted).

[55] *See* Edwin W. Patterson, *Builder's Measure of Recovery for Breach of Contract*, 31 Colum. L. Rev. 1286, 1287 (1932) ("The present article is confined to a study of the rules prescribing the award of damages to a builder for breach of a building or construction contract, with the inclusion, on the one hand, of the considerations of policy underlying the rules, and on the other hand, of the methods of applying them."). A careful reading of the article makes it clear that Professor Patterson has limited the scope of his article to situations where the builder is ***not*** the owner of the real estate upon which construction takes place, rendering the Professor's analysis inapplicable to the facts of this case.

Executive's allegation that "[a]n abundance of case law reaches the [] result [Executive seeks here]"[56] does not pass inspection. Executive fails to spend so much as a single word discussing the facts of the cases it relies upon, perhaps because each one differs factually from the case at bar.[57] In *M&R Contractors & Builders, Inc. v. Michael*,[58] M&R contracted to build a dwelling **on real estate owned by the Michaels**.[59] *Whiting v. Dodd*[60] involved a personal services contract for the services of a sales manager to oversee the liquidation of inventory in a "going out of business" sale.[61] *American Structural Systems, Inc. v. R.B. Gay Construction Co.*[62] was a battle between a subcontractor and a contractor over the scope of work to be performed between them. The owner of the real estate where the work was performed (a church) was not a party to the

---

[56] Docket No. 41, at 7.

[57] Over 20 years ago, this judge posted his brief writing tips to the Court's website. One bears repeating here:

> <u>Know the facts of the cases you cite</u>.  At the writing of this little ditty, there are almost 300 volumes of West's Bankruptcy Reporter [Note: this number is well over 600 today].  Suffice it to say that some judge, somewhere, sometime has written and published an opinion which contains the magic words which support your position.  It is extremely tempting to insert that quotation (I call them "sound bites") into your brief and say, "see, judge, other courts agree with me so I must be right."  This is a dangerous practice.  Courts decide real disputes.  Real disputes are fact driven.  For me, the facts of a case are at least as important as the legal analysis.  Be wary of the case which is factually dissimilar to yours, but has a great sound bite.  Be sure (either in your brief or at oral argument) to explain why the factually dissimilar case is applicable to your situation.  Also, be cognizant of the difference between the holding of a case and the dicta contained therein.  Most judges (this one included) find little value in dicta unless we already agree with it.

*Ten Tips for Effective Brief Writing (at Least With Respect to Briefs Submitted to Judge Michael)*, https://perma.cc/TX5G-CM4H. Put simply, sound bites and parsed quotes are a dime a dozen. Facts matter.

[58] 138 A.2d 350 (Md. 1958) (cited by Executive at Docket No. 41, at 7.).

[59] *Id.* at 351.

[60] 94 So. 2d 411 (Ala. Ct. App. 1957) (cited by Executive at Docket No. 41, at 7 n.13).

[61] *Id.* at 412.

[62] 619 So. 2d 366 (Fla. Dist. Ct. App. 1993) (cited by Executive at Docket No. 41, at 7 n.13).

lawsuit.[63] *Williams v. Kerns*[64] involved a contract to renovate an existing home where **the owner of the real estate** breached the contract.[65] *Stuart Kitchens, Inc. v. Stevens*[66] involved a contract for the sale of goods; namely, a set of items to be installed as part of a kitchen renovation.[67] *Jeremiah Sullivan & Sons, Inc. v. Kay-Locke, Inc.*[68] involved a contractor and their subcontractor in a dispute over the excavation of a building site; again, the owner of the underlying property was not a party to the lawsuit.[69] Finally, *VanVelsor v. Dzewaltowski*[70] was an action by the plaintiff builder against the owner relating to construction of "an exterior shell of a house on **defendants'** property[.]"[71] The legal analysis contained in *VanVelsor* is premised upon the fact that the plaintiff contractor was not the owner of the underlying real estate, a fact Executive conveniently ignores. None of the keystones laid by Executive are strong enough to bear the weight of its foundationally shaky arguments.

Executive managed to hit one nail on the head; it has persuaded a single Tulsa County District Court judge, in an unpublished and currently interlocutory decision, that the theory of the "volume builder" is legally sound.[72] The Court has reviewed Judge Drummond's three-page order and finds it unpersuasive. Judge Drummond patently ignores the difference between a sale of

---

[63] *Id.* at 366-67.

[64] 265 S.E.2d 605 (Ga. Ct. App. 1980) (cited by Executive at Docket No. 41, at 7 n.13).

[65] *Id.* at 606 ("In recent years, there has been some apparent confusion regarding the measure of damages to be applied when an owner has breached a construction contract.").

[66] 234 A.2d 749 (Md. 1967) (cited by Executive at Docket No. 41, at 7 n.13).

[67] *Id.* at 750-51 ("The dealer [Stuart Kitchens] had nothing to do with the remodeling, with the preparation of the room to receive the kitchen or with the installation of it.").

[68] 459 N.E.2d 837 (Mass. App. Ct. 1984) (cited by Executive at Docket No. 41, at 7 n.13).

[69] *Id.* at 838.

[70] 385 A.2d 1102 (Vt. 1978) (cited by Executive at Docket No. 41, at 7 n.13).

[71] *Id.* at 1103 (emphasis added).

[72] Docket No. 37-4 (*Executive Homes, LLC v. Glendening,* No. CJ-2022-3312 (Okla. Tulsa Cnty. Dist. Ct. March 3, 2023) (Order Sustaining Plaintiff's Motion for Partial Summary Judgment and Measure of Damages) (Drummond, D.J.)).

goods and a sale of real estate, relying upon principles espoused in the Uniform Commercial Code,[73] cases dealing with judgments entered for breach of warranty,[74] cases dealing with the performance of personal services,[75] and authorities discussed and deemed inapplicable *supra*. Judge Drummond also ignores the principle that the Oklahoma Uniform Commercial Code, by its express terms, applies only to the sale of goods.[76] Judge Drummond makes no mention of § 28. This Court does not know whether § 28 was brought to his attention or why, if it was, he chose to ignore it. In any event, the order is (on the record before this Court) interlocutory and far from definitive. Respectfully, the Uniform Commercial Code does not apply to sales of real estate under Oklahoma law. Section 28 does.

What Executive asks the Court to do is (almost) unprecedented. Executive seeks to arbitrarily define itself in a way that will allow it to evade Oklahoma statutory law. It asks the Court to espouse a legal theory that no published case or scholarly treatise has **ever** applied where

---

[73] *Id.* at 2, n.2. ("When used in the UCC context, it is called a lost volume seller.' [sic] A lost volume seller is one whose willingness and ability to supply is, as a practical matter, unlimited in comparison to the demand for the product.' A test to determine whether one is a lost volume seller has three components: (1) The peson [sic] who bought the resold entity would have been solicited by the plaintiff had there been no breach or resale; (2) The solicitation would have been successful; and (3) the plaintiff could have performed that additional contract. *Collins Ent. Corp. v. Coats & Coats Rental Amusement, 368 S.C. 410, 414, 629 S.E.2d 635, 637 (2006).* [italics in original] This is not a case under the UCC, but the definition helps best define a production builder."). Interestingly, Judge Drummond overlooks the pronouncement of the South Carolina Supreme Court that while "the lost volume seller theory is commonly understood to *apply to contracts involving the sale of goods*, it applies with equal force to contracts involving the performance of personal services." *Collins Ent. Corp.*, 629 S.E.2d at 637 (emphasis added). Nowhere does the *Collins* court mention extending the theory to encompass contracts for the sale of real estate. *Id.*

[74] *D.R. Horton, Inc.-Denver v. Bischof & Coffman Constr., LLC*, 217 P.3d 1262 (Colo. App. 2009) (relied upon by Judge Drummond at Docket No. 37-4, at 2-3).

[75] *See Osborn v. Comanche Cattle Indus., Inc.*, 545 P.2d 827 (Okla. Civ. App. 1975) (manure hauling contract for a feedlot) (relied upon by Judge Drummond at Docket No. 37-4, at 2-3).

[76] Okla. Stat. tit. 12A, § 2-102.

a buyer breaches a contract for the sale of real estate. Neither action is justified as a matter of fact or law.

The undisputed facts of this case establish that Executive built a dwelling on real estate it owned and contracted to sell that real estate to the Pottses. The Pottses breached the contract for sale of real estate and refused to close. Executive retained $20,000 of earnest money tendered to it and sold the Property for some $7,000 more than the Contract price. Executive has made all the profit it expected with respect to the Property, and perhaps more.[77] It is not entitled to sell the Property once and be paid its profits twice.

### Conclusion

The Motion for Summary Judgment is granted. Executive's claim for $159,741 in alleged lost profits from the sale of the Property is disallowed. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 31st day of July, 2023.

7844.7

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

[77] The Court makes no finding as to whether Executive is entitled to retain the $20,000 in earnest money and limits its ruling to disallowance of the Executive Claim as filed. In addition, given the disallowance of the Executive Claim for the reasons set forth above, the Court does not reach the other arguments advanced by Debtors for disallowance of the Executive Claim.